**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

KARI J.,[1]

                    Plaintiff,

v.

                               Case No. 3:23-cv-00128-HRH

MARTIN J. O'MALLEY,[2]
Commissioner of the Social Security Administration,

                    Defendant.

## DECISION AND ORDER

On or about July 8, 2020, Kari J. ("Plaintiff") protectively filed an application under

Title II of the Social Security Act,[3] with an alleged onset date of March 20, 2020.[4]  Plaintiff

---

[1] Plaintiff's name is partially redacted in accordance with Fed. R. Civ. P. 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Martin J. O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[3] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time.  Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Plaintiff brought a claim under Title II only.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, the Court cites the regulations governing disability determinations under both titles.

[4] Administrative Record ("A.R.") A.R. 20, 190.  The application summary, not the application itself, appears in the Court's record and is dated July 9, 2020.  A.R. 190.  Pursuant to 20 C.F.R. §§ 416.340-350, a protective filing date establishes the earliest possible application date based on a claimant's oral inquiry about eligibility or a verbal or written statement of intent to file for benefits.  Therefore, July 8, 2020, is considered Plaintiff's application filing date.  A.R. 190.

has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[5] Plaintiff's Opening Brief asks the Court to reverse and remand the agency's decision for the immediate payment of benefits, or in the alternative, for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).[6] The Commissioner filed the Administrative Record as his Answer and a Response Brief.[7] Plaintiff filed a Reply Brief.[8]

Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9] For the reasons discussed below, Plaintiff's request for relief at Docket 8 is GRANTED.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10] "Substantial evidence" has been defined by the United States Supreme Court as "such

---

[5] Docket 1 (Plaintiff's Compl.).

[6] Docket 8 (Plaintiff's Br.).

[7] Docket 7 (Notice of Lodging Admin. Record); Docket 10 (Commissioner's Br.). As of December 1, 2022, the Commissioner's "answer may be limited to a certified copy of the administrative record." *See* Fed. R. Civ. P., Supp. R. 4(b) of Soc. Sec. Actions under 42 U.S.C. § 405(g) (effective Dec. 1, 2022).

[8] Docket 11 (Reply).

[9] 42 U.S.C. § 405(g).

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 2 of 31

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11] Such evidence must be "more than a scintilla," but may be "less than a preponderance."[12] In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[15] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[17] In particular, the

---

[11] *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019) (reiterating that substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' ") (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation omitted).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotations and citations omitted).

[17] *Celaya v. Halter,* 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)).

Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[18] However, this duty exists "even when the claimant is represented by counsel."[19]

## II. DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance benefits ("DIB") to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[20] In addition, Supplemental Security Income ("SSI") may be available to individuals who do not have insured status under the Act but who are age 65 or older, blind, or disabled.[21] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[22]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual),

---

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted).

[19] *Mayes v. Massanari,* 276 F.3d 453, 459 (9th Cir. 2001) (citations omitted)..

[20] 42 U.S.C. § 423(a).

[21] 42 U.S.C. § 1381a.

[22] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[23]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[24] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[25] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[26] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[27] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity" ("SGA").[28] *The ALJ determined that Plaintiff had not engaged in SGA since March 20, 2020, the alleged onset date. The ALJ also determined that Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2025.*[29]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical

---

[23] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[24] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[25] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[26] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[27] *Tackett*, 180 F.3d at 1101 (emphasis in original).

[28] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[29] A.R. 22.

or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[30] *The ALJ determined that Plaintiff had the following severe impairments: diabetes myelitis, type I and interstitial cystitis ("IC"). The ALJ determined that Plaintiff's thyroid nodules and high cholesterol were non-severe.[31]*

**Step 3.** Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step.[32] *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[33]*

Residual Functional Capacity. Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.[34] Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including

---

[30] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[31] A.R. 23.

[32] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[33] A.R. 23.

[34] 20 C.F.R. §§ 404.1545(a), 416.945(a).

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 6 of 31

impairments that are not severe.[35]  *The ALJ determined that Plaintiff had the residual functional capacity to perform light work with the following limitations: sitting, standing, and walking for six hours each in an eight-hour workday; occasionally stooping and crouching; and frequently performing all other postures.[36]*

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[37]  Otherwise, the evaluation process moves to the fifth and final step.[38]  *The ALJ determined that Plaintiff was able to perform past relevant work as a receptionist.[39]*

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.[40]  *The ALJ did not reach step five in her analysis.[41]*

---

[35] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[36] A.R. 23.

[37] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[38] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[39] A.R. 28.

[40] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[41] A.R. 28.

The ALJ concluded that Plaintiff was not disabled at any time from March 20, 2020, the alleged onset date, through April 20, 2022, the date of the ALJ's decision.[42]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was 58 years old on the alleged disability date.[43]  From the alleged onset date through the date of the ALJ's decision, she was considered a "person of advanced age" (age 55 or older) by the Social Security Administration.[44]  Her past relevant work included work as a medical receptionist.[45]  Plaintiff alleged disability beginning March 20, 2020 due to type I diabetes and IC.[46]  Her claims were denied initially on September 9, 2020 and on reconsideration on July 28, 2021.[47]  The ALJ issued an unfavorable hearing decision dated April 20, 2022.[48]  On April 20, 2023, the Appeals Council denied Plaintiff's request for review.[49]  On June 13, 2023, Plaintiff timely appealed to this Court.[50]

The medical facts have been presented in the administrative hearing transcript, the ALJ's decision, and the briefs of the parties.  They are briefly summarized here.

---

[42] A.R. 29.

[43] A.R. 190.

[44] *See* 20 C.F.R. §§ 404.1563, 416.963.

[45] A.R. 243.

[46] A.R. 55.

[47] A.R. 64, 79.

[48] A.R. 20–29.

[49] A.R. 1–6.

[50] Docket 1.

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 8 of 31

In November 2018, Plaintiff had a spinal cord stimulator[51] placed. At a follow up visit, she reported that she had one week without pain and then her symptoms returned.[52] She also reported that hydrodistention and intravesical Botox treatments had not worked for her in the past.[53] Plaintiff underwent intravesical instillation therapy for IC[54] from August through December 2019 and again from January 2020 through July 2020.[55] She reported to her treating provider in January 2020 that the IC bladder instillations helped, but only if she went in for treatment every week or every two weeks. Despite treatment, she continued to report stabbing pain on the left side and chronic problems initiating stream, dysuria, and frequency of voids.[56] Plaintiff reported to a different provider in January 2020 that even after the neurotransmitter implant in 2018, "she continues to have significant dysuria and frequency," between 20 to 40 times a day.[57] The next month she also reported continued IC symptoms.[58]

---

[51] A spinal cord stimulator is a medical device for the treatment of chronic pain. *See* *https://my.clevelandclinic.org/health/treatments/24237-spinal-cord-stimulator-scs*.

[52] A.R. 440.

[53] A.R. 352.

[54] Intravesical instillation therapy is also referred to as bladder instillations. Bladder instillations or bladder cocktails are mixtures of medications put directly into the bladder. *See* *https://www.ichelp.org/understanding-ic/medical-treatments/bladder-instillations/*.

[55] *See e.g.,* A.R. 306, 308, 310, 312, 314, 316, 318, 321, 323, 325, 327, 329, 331, 333, 335, 337, 339, 341, 343, 345, 347.

[56] A.R. 319–20.

[57] A.R. 391.

[58] A.R. 396.

In February 2020, Plaintiff underwent surgery to place a trial dermatomal specific spinal column stimulator and followed up shortly thereafter with a permanent placement.[59] Immediately after the procedures, Plaintiff reported a complete resolution of pain, significantly reduced urinary incidences, no need for breakthrough medications, and improved sleep.[60] She reported continued success with the stimulator on March 4, 2020.[61]

On January 11, 2021, Plaintiff reported an increase in IC symptoms. She also reported a decrease in the efficacy of her bladder instillations despite weekly treatment. Her treating provider at Alaska Urology, Jamie Zipsir, PA-C, noted that Plaintiff's worsening of symptoms might have been caused by stopping her Elmiron[62] prescription and her neurostimulator not being serviced recently. PA Zipsir also recommended that Plaintiff see Andre Godet, M.D., for a cystoscopy to assess for bladder lesions. PA Zipsir prescribed gabapentin.[63]

On January 21, 2021, Plaintiff underwent a cystoscopy. The cystoscopy showed an abnormal bladder with diffuse erythema of the posterior bladder wall and no tumors or active ulcerated lesions. Dr. Godet noted that Plaintiff's bladder erythema/irritation was

---

[59] A.R. 417–21.

[60] A.R. 397–412.

[61] A.R. 413.

[62] Elmiron is used to treat pain and discomfort from interstitial cystitis. *See* https://www.webmd.com/drugs/2/drug-14085/elmiron-oral/details.

[63] A.R. 451–53.

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 10 of 31

"of a significant size" and warranted bladder cauterization.[64]  Approximately one month later, her provider noted Plaintiff's recent cystoscopy revealed an area of erythema and had "[g]iven her increased bladder pain." He recommended fulguration.[65]

Plaintiff underwent intravesical instillation therapy again from March 2021 through May 2021.[66]  She reported not seeing the same effects from the instillation therapy and that her IC symptoms had worsened over the past year.[67]

On June 18, 2021, Plaintiff proceeded with fulguration to decrease bladder pain. Dr. Godet's diagnosis after the operation was IC with a Hunner ulcer and papillary lesion at the right ureteral orifice.[68]  Plaintiff reported significantly reduced pain after surgery, but she continued to have "some good and bad days when it comes to urinary frequency" and recognized some irritants.[69]

In February 2022, she reported dysuria and difficulty going to the bathroom.[70]  The next month, Plaintiff reported progressive bladder pain "to the point it can be painful to sit down," as well as urgency, frequency, and nocturia.[71]

//

---

[64] A.R. 450.

[65] A.R. 447.

[66] *See e.g.,* A.R. 527, 529, 531, 533, 541, 543.

[67] A.R. 535.

[68] A.R. 520–21.

[69] A.R. 516.

[70] A.R. 515.

[71] A.R. 511.

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 11 of 31

# IV. DISCUSSION

Plaintiff is represented by counsel in this appeal. She alleges that the ALJ failed to provide legally adequate rationale for finding Laurie Montano, M.D.'s, opinion unpersuasive and failed to provide specific, clear, and convincing reasons for rejecting Plaintiff's symptom allegations.[72] She also alleges that the additional evidence submitted after the ALJ's decision "directly contradicts many of the reasons the ALJ set forth for discounting the severity of Plaintiff's allegations" and the Court should remand to properly consider this evidence.[73] The Commissioner disagrees and urges the Court to affirm.[74]

## A. Plaintiff's Subjective Symptom Testimony and Reports

Plaintiff asserts that the ALJ failed to provide specific, clear, and convincing reasons for rejecting her allegations about the impact of her impairments. Plaintiff provides several reasons, including: (1) the ALJ failed to explain how normal physical examination findings "wholly unrelated to Plaintiff's impairment," undermine her symptoms; (2) the ALJ "cherry-picked" the treatment notes for references suggesting Plaintiff's symptoms from IC were temporary and that she was reluctant to take medications; (3) Plaintiff's lack of acute distress at medical appointments is not an adequate reason for discounting her pain; (4) the records show Plaintiff's symptoms

---

[72] Docket 8 at 9–20.

[73] Docket 8 at 20–22.

[74] Docket 10 at 2–10.

worsening over time; and (5) the ALJ failed to include time away from work to attend weekly in-office treatments in the RFC.[75]

Plaintiff initially claimed disability due to type I diabetes and IC.[76] In the function report completed on August 12, 2020, Plaintiff reported that her ability to work was impaired by needing to use the restroom 15 to 20 times per day with a lot of pain. She reported that her impairments affected her sleep. Specifically, she stated that she was "up all night going to the bathroom and if I am having low blood sugar." When she experienced bladder pain, Plaintiff reported that it was hard for her to walk, bend, stand, or concentrate.[77]

On April 5, 2022, Plaintiff appeared with representation and testified by telephone before ALJ Laura Valente. At the hearing, she testified that she had worked as a medical receptionist since 2004. She testified that she quit her last job in March 2020 due to pain and needing to go to the bathroom too often. She indicated that she had been experiencing symptoms for about 10 years, but that her symptoms had gradually gotten worse. Plaintiff testified that she had undergone multiple surgeries and treatments to relieve her symptoms. She stated that she had undergone a bladder extension three weeks prior to the hearing, but that her pain was starting to come back. She testified that she had flares every day and that these flares consisted of burning, itching, and pelvic pain. She testified that needed to use the restroom upwards to 15 to 20 times per day.

---

[75] Docket 8 at 14–20.

[76] A.R. 55.

[77] A.R. 232–39.

She indicated that she was able to do housework, cook, drive, and grocery shop slowly with frequent breaks. She also indicated that she could not perform her activities of daily living when she was in too much pain. Plaintiff stated that when her blood sugar levels were high, it also affected her bladder symptoms.[78]

### 1. Legal Standards

An ALJ's assessment of a claimant's symptoms has two steps.[79] First, the ALJ determines whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[80] In the first step, the claimant need not "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof."[81]

Second, if the claimant has satisfied step one and the ALJ has determined that the claimant is not malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. This standard is "the most demanding required in Social Security cases."[82] Yet, this does

---

[78] A.R. 40–50.

[79] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017), *superseded on other grounds by* 20 C.F.R. §404.1502(a).

[80] *Id.* (quoting *Garrison,* 759 F.3d at 1014–15).

[81] *Garrison,* 759 F.3d at 1014 (internal citations and quotations omitted).

[82] *Trevizo,* 871 F.3d at 678.

not mean an ALJ is required to "simply accept a claimant's subjective symptom testimony notwithstanding inconsistencies between that testimony and the other objective medical evidence in the record, allowing a claimant's subjective evidence to effectively trump all other evidence in a case."[83]

In this case, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms that Plaintiff described. The ALJ then found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.[84]

Because the ALJ found Plaintiff's underlying impairments severe and cited no evidence of malingering, she was required to provide specific, clear, and convincing reasons for rejecting Plaintiff's subjective symptom allegations. The ALJ provided several reasons, including: the objective evidence in the record "does not corroborate" Plaintiff's allegations (*see Section 2, Objective Evidence and the Longitudinal Record*); Plaintiff's claims of disabling bladder issues were inconsistent with her "largely benign" physical presentation at appointments (*see Section 3, Clinical Observations and Demeanor*); Plaintiff's symptoms improved with procedures (*see Section 4, Improvement with Treatment*); and Plaintiff did not follow prescribed treatments (*see Section 5, Non-Compliance with Treatment Recommendations*).

//

---

[83] *Smartt v. Kijakazi,* 53 F. 4th 489, 499 (9th Cir. 2022).

[84] A.R. 25.

## 2. Objective Evidence and the Longitudinal Record

"Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."[85]  Here, the ALJ concluded that the objective findings did not support Plaintiff's symptom testimony and reports.  Specifically, the ALJ rejected Plaintiff's claims of "profoundly limiting and constant urinary frequency, pain, and incontinence."[86]

However, the Court's review of the medical record shows that Plaintiff underwent multiple procedures and received treatments for IC during her alleged disability period.[87] The record also demonstrates that Plaintiff experienced initial relief from these procedures and treatments, but that her symptoms would return, requiring additional surgeries and treatments.[88]

Moreover, the ALJ's evaluation ignores the unique symptoms of Plaintiff's IC and the SSA's guidance provided in Social Security Ruling ("SSR") 15-1p.  The symptoms listed by SSR 15-1p include: chronic bladder and pelvic pain, pressure, and discomfort; urinary urgency and frequency; and other symptoms such as sleep dysfunction and

---

[85] *Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1161 (9th Cir. 2008)

[86] A.R. 26.

[87] *See e.g.,* A.R. 306, 308, 310, 312, 314, 316, 318, 321, 323, 325, 327, 329, 331, 333, 335, 337, 339, 341, 343, 345, 347 (intravesical instillation therapy), 417–21 (spinal column stimulator), 440 (neurostimulator placed), 450 (cystoscopy), 520–21 (fulguration), 527, 529, 531, 533, 541, 543 (intravesical instillation therapy).

[88] *See e.g.,* A.R. 319 (IC treatments helped, but needed every week or two weeks), 352 (failed hydrodistention and intravesical Botox treatments), 391, 396 (continued IC symptoms), 440 (pain and IC symptoms returned one week after neurostimulator placed in 2018), 511 (progressive bladder pain to the point it can be painful to sit down, urgency, frequency, nocturia), 515 (dysuria and difficulty going to bathroom), 516 (some good and bad days when it comes to urinary frequency), 535 (IC symptoms worsened over last year).

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 16 of 31

chronic fatigue or tiredness.[89]  At various times in the record, Plaintiff reported all of these symptoms.[90]

According to SSR 15-1p, symptoms particular to IC may affect functional capacity and affect a claimant's ability to return to past relevant work.  The ruling states:

> For example, many people with IC have chronic pelvic pain, which can affect the ability to focus and sustain attention on the task at hand. Nocturia may disrupt sleeping patterns and lead to drowsiness and lack of mental clarity during the day. Urinary frequency can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night. Consequently, some individuals with IC essentially may confine themselves to their homes.[91]

Yet, the ALJ did not include any limitations for Plaintiff's IC in the one hypothetical she posed to the vocational expert at the April 2022 hearing or in the RFC.[92]

In sum, the ALJ's provided reason that the objective findings did not support Plaintiff's symptom complaints is not clear and convincing.

---

[89] SSR 15-1p, 2015 WL 1292257, at *4 (Mar. 18, 2015).  Social Security Rulings are issued by the Commissioner to clarify the Commissioner's regulations and policies. *Bunnell v. Sullivan*, 947 F.2d 341, 346 n. 3 (9th Cir. 1991).  Although they do not have the force of law, they are nevertheless given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (Social Security Rulings are "binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases.").

[90] *See e.g.,* A.R. 319 ("stabbing" pain in left side, "push" to initiate stream, dysuria, and frequency of voids), 349 ("Stabbing" pain in left side, push to initiate stream), 392 (persistent IC with neuralgia, dysuria, and frequency), 394 (continuous stabbing pelvic pain), 396 (continues to have symptoms consistent with IC), 451 (reported worsening bladder pain), 471 (endorses trouble sleeping due to cystitis), 511 (progressive bladder pain to the point it can be painful to sit down, urgency, frequency, and nocturia), 515 (dysuria), 516 (good days and bad days when it comes to urinary frequency).

[91] SSR 15-1p, 2015 WL 1292257, at *8 (Mar. 18, 2015).

[92] A.R. 23, 51–52.

*3.    Clinical Observations and Demeanor*

In assessing Plaintiff's subjective symptom testimony, the ALJ may consider inconsistencies between a claimant's testimony and the treatment record.[93]    A determination that a claimant's subjective complaints are inconsistent with clinical observations can provide a clear and convincing reason for discrediting a claimant's testimony where the ALJ specifies how Plaintiff's particular complaints are contradicted by the clinical observations.[94]

Here, the ALJ found that Plaintiff's subjective complaints were inconsistent with her clinical presentation.  Specifically, the ALJ noted Plaintiff's physical presentation at appointments as "largely benign" with a normal mood and affect, normal communication, a normal gait without deficits in motor strength or sensation, an ability to change positions normally, and normal cranial nerves.[95]  First, this assumes that "a claimant need not be believed unless the claimant acted in an agitated and disagreeable manner, an anomalous result."[96]  Moreover, recent Ninth Circuit district courts decisions have held that "it is questionable whether a chart note of 'no acute distress' is relevant to allegations of chronic symptoms."[97]    In this case, despite "normal" physical presentations at

_____

[93] *Ghanim v. Colvin,* 763 F.3d 1154, 1164 (9th Cir. 2014).

[94] *Regennitter v. Comm'r of Soc. Sec. Admin.,* 166 F.3d 1294, 1297 (9th Cir. 1999).

[95] A.R. 25.

[96] *Childress v. Colvin,* Case No. 13-cv-03252-JSC, 2014 WL 4629593, at *13 (N.D. Cal. Sep. 16, 2014).

[97] *See e.g., Troy A.H. v. Comm'r of Soc. Sec.,* Case No. 13-cv-03252-JSC, 2022 WL 336846, at *5 (D. Or. Feb. 4, 2022)*; Mitchell v. Saul,* Case No. 2:18-cv-01501-GMN-WGC, 2020 WL 1017907, at *7 (D. Nev. Feb. 13, 2020) ("Moreover, the court agrees with Plaintiff that notations that Plaintiff was healthy 'appearing' and in no 'acute' distress do not distract from the findings

appointments, the longitudinal record demonstrates that Plaintiff's IC symptoms were chronic.[98]

In sum, the ALJ did not provide a clear and convincing reason for discounting Plaintiff's pain complaints based on clinical observations.

4.    *Improvement with Treatment*

"[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."[99]  At the same time, symptom improvement must be evaluated in the context of the "overall diagnostic picture[.]"[100]   And, "there can be a great distance between a patient who responds to treatment and one who is able to enter the workforce[.]"[101]

Here, the ALJ pointed to a period of improvement from February 17, 2020 to January 2021, including Plaintiff's alleged onset date of March 20, 2020, to conclude that any exacerbations of Plaintiff's IC symptoms were temporary.[102]   However, the record shows that during the 11 months between February 2020 and January 2021, Plaintiff

---

regarding Plaintiff's chronic conditions."), *report and recommendation adopted sub nom. Mitchell v. Berryhill,* 2020 WL 1017899 (D. Nev. Feb. 28, 2020); *Richard F. v. Comm'r of Soc. Sec,* Case No. C19-5220-JCC, 2019 WL 6713375, at *7 (W.D. Wash. Dec. 10, 2019) ("Clinical findings of 'no acute distress' do not undermine Plaintiff's testimony . . . 'Acute' means 'of recent or sudden onset; contrasted with chronic.' Oxford English Dictionary, acute (3d ed. December 2011). Plaintiff's impairments are chronic, not acute.") (citation to the administrative record omitted).

[98] *See supra* n. 88.

[99] *Wellington v. Berryhill,* 878 F.3d 867, 876 (9th Cir. 2017).

[100] *Holohan,* 246 F.3d at 1205.

[101] *Garrison,* 759 F.3d at 1017 n.23 (internal quotations and citation omitted).

[102] A.R. 26.

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 19 of 31

received instillation therapy in June 2020 and July 2020.[103]   Moreover, as discussed above, the overall longitudinal record shows a pattern of improvement after procedures and treatments, followed by an increase in symptoms and a need for more procedures and treatments.[104]

     5.    *Non-Compliance with Treatment Recommendations*

A claimant's unexplained failure to seek further treatment or follow through on recommended treatment may amount to substantial evidence in support of an ALJ's determination that the claimant's pain is not as severe as alleged.[105]   However, if a claimant provides evidence of a good reason, the claimant's failure to follow through on recommended treatment is not a clear and convincing reason to discredit her testimony.[106]

In this case, the ALJ discounted Plaintiff's symptom complaints, in part, because Plaintiff stopped her Elmiron prescription due to a potential side effect of macular degeneration.[107]   The ALJ also noted that at one visit, Plaintiff reported not having her

---

[103] A.R. 306, 308.

[104] *See supra* n. 88.

[105] *Orn v. Astrue,* 495 F.3d 625, 638 (9th Cir. 2007) ("Our case law is clear that if a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated.").

[106] *Glanden v. Kijakazi,* 86 F.4th 838, 847 (9th Cir. 2023) (citation omitted).

[107] A.R. 26.

neurostimulator device checked or calibrated and noted that Plaintiff was reluctant to start gabapentin despite it being prescribed by her provider.[108]

However, these examples do not represent the longitudinal record. First, although Plaintiff elected not to continue Elmiron for IC pain due to its side effects and was initially hesitant to use gabapentin, it appears that her providers regularly prescribed pain medication, such as gabapentin and Cymbalta.[109] Moreover, treatment notes and Dr. Godet's opinion letter substantiate Plaintiff's fear of adverse side effects from Elmiron.[110] Additionally, it appears that Plaintiff reported not checking or calibrating her neurostimulator only one time.[111]

In this case, non-compliance with treatment recommendations was not a clear and convincing reason to discount Plaintiff' symptom complaints.

6.      *Weekly Treatments and the Ability to Work*

Plaintiff asserts that the ALJ erred by failing "to acknowledge the resulting absences from work that Plaintiff would require to maintain" her weekly intravesical instillation treatments.[112] The Commissioner counters that "the Ninth Circuit has rejected the argument that regular medical appointments would necessarily cause a claimant to

---

[108] A.R. 26.  *See* A.R. 451, 453.

[109] *See e.g.,* A.R. 447, 452, 465, 479, 484, 487, 490, 511, 516, 523, 536, 556, 578.  Gabapentin and Cymbalta can be used to help relieve nerve pain.  https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details and https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details.

[110] *See e.g.,* A.R. 15, 511.  *See also Carmickle,* 533 F.3d at 1162 (ALJ's reasoning was rejected when treatment notes indicated that Plaintiff's fear of medication side effects was substantiated.).

[111] A.R. 451.

[112] Docket 8 at 19.

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 21 of 31

miss work."[113]  In support, the Commissioner cites two unpublished Ninth Circuit decisions and unpublished decisions from other Circuits.[114]  In these cases, the Circuits held that, given the particular facts of each case, the claimants did not present evidence sufficient to establish that the frequency of their medical appointments inhibited their ability to work on a "regular and continuing basis," pursuant to SSR 96-8p.[115]  However, the Ninth Circuit has also remanded when the claimant *has* presented evidence sufficient to establish the possibility that the frequency of medical appointments inhibit a claimant's ability to work.[116]

---

[113] Docket 10 at 4.

[114] Docket 10 at 4–5.

[115] SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  *See Johnson v. Kijakazi,* No. 21-35844, 2022 WL 2953698 (9th Cir. July 26, 2022) ("Johnson's nine appointments within five months seem unlikely to have inhibited Johnson's ability to work, especially considering Johnson provided no evidence showing that his appointments lasted entire workdays or would continue to persist."); *Goodman v. Berryhill,* 741 F. App'x 530, 530 (9th Cir. 2018) (unpublished) ("Because the evidence showed Goodman could work a non-traditional work shift (nights), any error attributable to the ALJ's failure to discuss the effect of Goodman's frequent medical appointments on his ability to hold a traditional day job was harmless."); *Best v. Berryhill,* 730 F. App'x 380, 382 (7th Cir. 2018) (unpublished) ("The vocational expert testified that employers generally tolerate up to three absences per month, and Best cannot point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours."); *Cherkaoui v. Comm'r of Soc. Sec.,* 678 F. App'x 902, 904 (11th Cir. 2017) (unpublished) ("[N]othing in the record indicates that Cherkaoui was required, or would be required, to schedule her medical appointments during working hours so that they would interfere with her ability to obtain work."); *Razo v. Colvin,* 663 F. App'x 710, 717 (10th Cir. 2016) (unpublished) ("Even if [missing work at least three times per month for medical appointments] were necessary following surgery, it does not mean Mr. Razo would be required to attend follow-up appointments indefinitely, nor does it mean he could not perform work on a regular and continuing basis.").

[116] *See Bourcier v. Saul,* 856 F. App'x 687, 690–91 (9th Cir. 2021) ("Claimant has presented evidence sufficient to establish the possibility that the frequency of her medical appointments may inhibit her ability to work on a 'regular and continuing basis.'").

Here, Plaintiff underwent intravesical instillation treatments weekly or biweekly during much of the alleged disability period.[117]  She testified that she had been going to weekly bladder treatments for at least a year before her April 2022 hearing.[118]  She also submitted evidence that these appointments required at least one hour.[119]  In his July 2022 letter, Dr. Godet also noted that Plaintiff was continuing with in-office bladder treatments "with some moderate relief of pain."[120]

Although the record does not contain direct evidence that Plaintiff's bladder treatments must be done during work hours or would interfere with a regular work schedule, it may be reasonably inferred that these appointments, if medically necessary, occur frequently enough to inhibit Plaintiff's ability to work.[121]  Moreover, the vocational expert testified that an individual who missed two days of work or more per month on a regular and ongoing basis would eventually be terminated due to lack of reliability.[122]

On remand, the ALJ should also evaluate how the frequency of Plaintiff's medical appointments affect her ability to work on a regular and continuing basis.

//

//

---

[117] *See e.g.,* A.R. 306, 308, 310, 312, 314, 316, 318, 321, 323, 325, 327, 329, 331, 333, 335, 337, 339, 341, 343, 345, 347, 451, 527, 529, 531, 533, 535, 541, 543.

[118] A.R. 47.

[119] A.R. 347.

[120] A.R. 15.

[121] *See e.g., Bourcier,* 856 F. App'x at 691; *Soto v. Comm'r of Soc. Sec. Admin.,* No. CV-22-01811-PHX-JJT, 2024 WL 1340710, at *3–5 (D. Ariz. Mar. 29, 2024).

[122] A.R. 28, 52.

**B.    Medical Opinion Evidence**

Plaintiff alleges that the ALJ did not adequately evaluate the persuasiveness of Laurie Montano, M.D.'s, opinion.[123]  Because Plaintiff protectively filed her application on or about July 8, 2020, the revised regulations governing the evaluation of medical evidence are applicable here.

*1.    Legal Standard*

Under the revised regulations in effect March 27, 2017, the definition of what constitutes a medical opinion has been narrowed, focusing on what the claimant can do despite her impairments and what work-related limitations are present.[124]  The new regulations define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i)    Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)    Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii)    Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

---

[123] Docket 8 at 9–13.

[124] *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1513(a)(2).

(iv)     Your ability to adapt to environmental conditions, such as temperature or fumes.[125]

The revised regulations further provide that the ALJ no longer gives any particular weight to a medical opinion based on its source, thereby eliminating the treating source rule.[126] Instead, the ALJ considers the persuasiveness of a medical opinion based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, extent, and type of treatment; (4) specialization; and (5) other relevant factors that support or contradict the medical opinion.[127]

Supportability and consistency are considered the most important factors for evaluating persuasiveness.[128] Supportability and consistency are explained as follows in the regulations:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency.   The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

---

[125] 20 C.F.R. § 404.1513(a)(2).

[126] *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844-01 (Jan. 18, 2017), 2017 WL 168819, at *5867–68; 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (for claims filed on or after March 27, 2017).

[127] 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

[128] The regulations state, "The factors of supportability . . . and consistency . . . are the most important factors [the SSA] consider[s] when [the SSA] determine[s] how persuasive [the SSA] find[s] a medical source's medical opinions or prior administrative medical findings to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (for claims filed on or after March 27, 2017).

sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[129]

Generally, these are the only two factors the ALJ is required to address in her decision.[130] However, when two or more medical opinions or prior administrative medical findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must explain how "the other most persuasive factors" were considered.[131] In the Ninth Circuit, the current regulatory framework no longer requires ALJs to provide "specific and legitimate" or "clear and convincing" reasons for rejecting a treating or examining medical source's opinion.[132]

2.   *Medical Opinion of Laurie Montano, M.D.*

On April 1, 2022, Laurie Montano, M.D., completed a medical source statement. She opined that Plaintiff had "few physical issues," but that her IC and diabetes symptoms prevented Plaintiff from meeting the physical demands of even sedentary work, particularly when she was experiencing a flare of IC. Dr. Montano specified that during a flare, Plaintiff would need to take restroom breaks every 15 minutes and suffered from significant pain, resulting in an inability to sit, stand, or walk at all. She also opined that due to bladder/urethral burning and interruptions from urinary frequency, sitting was the

---

[129] 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

[130] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").

[131] 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (for claims filed on or after March 27, 2017).

[132] *Woods v. Kijakazi,* 32 F.4th 785 (9th Cir. 2022).

hardest for Plaintiff. Dr. Montano also provided functional limitations limiting Plaintiff to less than sedentary work during active IC flares.[133]

This Court is confined to reviewing the reasons the ALJ asserts.[134] In this case, the ALJ provided the following reasons for finding Dr. Montano's opinion unpersuasive: (1) Dr. Montano did not cite or refer to any objective evidence to support her statements, in particular, her references to Plaintiff's IC "flares"; (2) the limitations are not entirely supported by Dr. Montano's own treatment notes; and (3) the opinion is not consistent with the overall evidence.[135]

An ALJ may properly reject a medical opinion that is conclusory or unsupported by clinical findings.[136] An ALJ may also discount a medical opinion as inconsistent with the provider's own treatment notes.[137] But, an ALJ may not "cherry pick" evidence to discount a medical opinion.[138] Dr. Montano was Plaintiff's primary care physician and most of her treatment notes involved managing Plaintiff's diabetes.[139] During this time, Dr. Godet managed her IC.[140] Consequently, it is not clear that Dr. Montano's treatment notes

---

[133] A.R. 567–72.

[134] *Brown-Hunter,* 806 F.3d at 494 ("As we have long held, we are constrained to review the reasons the ALJ asserts.") (quotations, citations, and emphasis omitted).

[135] A.R. 27–28.

[136] *Chaudhry v. Astrue,* 688 F.3d 661, 671 (9th Cir. 2012).

[137] *See Ghanim v. Colvin,* 763 F.3d 1154, 1161 (9th Cir. 2014); *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007).

[138] *Ghanim,* 763 F.3d at 1164.

[139] *See e.g.,* A.R. 479–95.

[140] A.R. 15, 492.

conflict with her medical opinion, instead, they merely address Plaintiff's other medical symptoms. However, Dr. Godet's opinion letter submitted after the ALJ decision, supports Dr. Montano's opinions regarding Plaintiff's IC symptoms of pain and interruptions from urinary frequency.[141] Moreover, her opinions regarding Plaintiff's IC symptoms of pain and interruptions from urinary frequency are supported by the longitudinal record.[142]

For the above reasons, the ALJ's finding that Dr. Montano's opinion is unpersuasive is not supported by substantial evidence. On remand, the ALJ should re-evaluate Dr. Montano's medical opinion in the context of the overall record, including the evidence submitted after the ALJ decision.

## C. Additional Evidence Submitted After the ALJ Decision

As asserted by the Commissioner, this Court has no jurisdiction to review the Appeals Council's decision denying Plaintiff's request for review because it is not a final agency action.[143] However, because the new evidence is part of the administrative record, it may be considered by the Court "in determining whether the ALJ's decision was supported by substantial evidence."[144] Specifically, the additional evidence consists of a letter from Dr. Montano and a medical opinion from Plaintiff's urologist, Dr. Godet.

---

[141] A.R. 15–16.

[142] *See e.g.,* A.R. 319 ("stabbing" pain in left side, "push" to initiate stream, dysuria, and frequency of voids), 349 ("Stabbing" pain in left side, push to initiate stream), 392 (persistent IC with neuralgia, dysuria, and frequency), 394 (continuous stabbing pelvic pain), 396 (continues to have symptoms consistent with IC), 451 (reported worsening bladder pain), 471 (endorses trouble sleeping due to cystitis), 511 (progressive bladder pain to the point it can be painful to sit down, urgency, frequency, and nocturia), 515 (dysuria), 516 (good days and bad days when it comes to urinary frequency).

[143] *See Taylor v. Comm'r of Soc. Sec. Admin.,* 659 F.3d 1228, 1231 (9th Cir. 2011).

[144] *Revels v. Berryhill,* 874 F.3d 648, 665 (9th Cir. 2017) (citing *Brewes v. Comm'r of Soc. Sec.*

On July 5, 2022, Dr. Godet provided a medical opinion. He summarized the records involving Plaintiff's IC diagnosis, symptoms, and treatments. Dr. Godet described Plaintiff's symptoms including "a constant bladder pressure/urge to void associated with urinary frequency hourly and constant painful voiding." He explained Plaintiff's discontinuation of Elmiron based on "research that has found that Elmiron is strongly linked to a degenerative eye condition called pigmentary maculopathy." Dr. Godet opined that Plaintiff "has made a concerted effort over the years to address her chronic interstitial cystitis with limited relief of symptoms which have resulted in debilitation and not being able to perform her work duties adequately."[145]

In a letter dated September 1, 2022, Dr. Montano reported that Plaintiff worked in her medical office for one day. She stated that Plaintiff "struggled with the pace of [the medical office during a COVID vaccine clinic] and had to leave the front office unattended many times to use the restroom." She also noted that Plaintiff called the next day and informed her that she could not return to work due to "significant bladder symptoms."[146]

The exclusion of the above additional evidence by the Appeals Council was not harmless error. It supports and is consistent with Dr. Montano's medical opinion and Plaintiff's symptom complaints. Moreover, Dr. Godet's opinion is supported by specific references to treatments and procedures prescribed and performed to relieve Plaintiff's

_____

*Admin.,* 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]e have routinely considered evidence submitted for the first time to the Appeals Council to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence.")).

[145] A.R. 15–16.

[146] A.R. 14.

IC symptoms. Therefore, the Court cannot conclude that no reasonable ALJ, after considering Dr. Montano's letter and Dr. Godet's medical opinion, could have reached a different disability determination.[147] On remand, the ALJ should be given the opportunity to review the additional evidence.[148]

### D.      Scope of Remand

Plaintiff requests that the Court reverse the SSA's final decision and remand for the immediate payment of benefits, or in the alternative, remand for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).[149] The decision whether to remand for further proceedings or for the immediate payment of benefits is within the discretion of the Court.[150] When prejudicial error has occurred, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation[.]"[151]

As shown above, the ALJ's reasons for discounting Dr. Montano's opinion and Plaintiff's symptom testimony were not supported by substantial evidence. And the ALJ should be given the opportunity to evaluate the record evidence submitted after the ALJ's decision. Therefore, there are outstanding issues that must be resolved before a determination of disability can be made.

---

[147] *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d, 1050, 1056 (9th Cir. 2021) (An error is not harmless unless the reviewing court "can confidently conclude that no reasonable ALJ, when fully crediting the [evidence], could have reached a different disability determination.").

[148] The Court notes that the copy of Dr. Godet's letter in the record appears to be missing some information. If this is accurate, the entire letter should be included in the record on remand. *See* A.R. 16.

[149] Docket 9 at 16.

[150] *Garrison,* 759 F.3d at 1019.

[151] *Dominguez v. Colvin,* 808 F.3d 403, 407 (9th Cir. 2015) (quoting *Treichler,* 775 F.3d at 1099).

The proper remedy in this case is to remand for further administrative proceedings, including a *de novo* hearing and new decision consistent with this Decision and Order.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not supported by substantial evidence.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 8 is GRANTED.  The Commissioner's final decision is REVERSED and REMANDED for further administrative proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The Court DIRECTS the Clerk of this Court to enter judgment in favor of Plaintiff and close this case accordingly.

DATED this 29th day of April 2024, at Anchorage, Alaska.


/s/   H.   Russel   Holland
H. RUSSEL HOLLAND
UNITED STATES DISTRICT JUDGE

Case No. 3:23-cv-00128-HRH, *Kari J. v. O'Malley*
Decision and Order
Page 31 of 31
Case 3:23-cv-00128-HRH   Document 13   Filed 04/29/24   Page 31 of 31